# EXHIBIT - B

| | |
|---|---|
| **DISTRICT COURT, WELD COUNTY, COLORADO**<br>901 9th Avenue,<br>Greeley, Colorado 80631<br><br>**Karen Alexander, Individually and On Behalf of her Minor Children, and All Others Similarly Situated,**<br><br>     **Plaintiff(s),**<br>**v.**<br><br>**Salud Family Health, Inc.,**<br>     **Defendant.** | DATE FILED: November 14, 2022 5:37 PM<br>FILING ID: 7C55B8459175C<br>CASE NUMBER: 2022CV30848<br><br><br><br><br>▲ ▲<br>**COURT USE ONLY** |
| **ATTORNEYS FOR PLAINTIFF(S):**<br><br>**Rick D. Bailey, Esq.**<br>Atty. Reg. #26554<br>Law Office of Rick D. Bailey, Esq.<br>1801 Broadway, Ste. 528<br>Denver, Colorado 80202<br>Phone: (720) 676-6023<br>Email: rick@rickbaileylaw.com<br><br>**MASON LLP**<br>Gary E. Mason (pro hac vice forthcoming)<br>Danielle L. Perry (pro hac vice forthcoming)<br>Lisa A. White (pro hac vice forthcoming)<br>5101 Wisconsin Ave., NW, Ste. 305<br>Washington, DC 20016<br>Phone: 202.640.1160<br>Fax: 202.429.2294<br>gmason@masonllp.com<br>dperry@masonllp.com<br>lwhite@masonllp.com | **Case Number:** |
| **CLASS ACTION COMPLAINT AND JURY DEMAND** | |

## CLASS ACTION COMPLAINT

1.     Plaintiff(s) Karen Alexander ("Plaintiff(s)"), individually, on behalf of her minor

children, and on behalf of all others similarly situated, bring this action against Salud Family

Health ("Salud" or "Defendant") to obtain damages, restitution, and injunctive relief from

Defendant. Plaintiff(s) make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and facts that are a matter of public record.

## NATURE OF THE ACTION

2.      This class action arises out of the recent data security incident and data breach that was perpetrated against Defendant Salud (the "Data Breach"), which held in its possession certain personally identifiable information ("PII") and protected health information ("PHI") (collectively, "the Private Information") of Plaintiff(s) and other employees and patients of Defendant Salud, the putative class members ("Class"). This Data Breach was discovered by Salud around September 5, 2022.

3.      The Private Information compromised in the Data Breach included certain personal or protected health information of current and former patients and employees, including Plaintiff(s). This Private Information included, but is not limited to: "name, Social Security number, driver's license number or Colorado identification card number, financial account information/credit card number, passport number, medical treatment and diagnosis information, health insurance information, biometric data, and username and password."[1]

4.      The Private Information compromised in what Salud refers to as a "network security incident" in which "there was unauthorized access to the affected systems on September 5, 2022 and that certain data may have been accessed or taken."[2] In other words, the cybercriminals intentionally targeted Salud for the highly sensitive Private Information it stores on its computer network, attacked the insufficiently secured network, then exfiltrated highly

---

[1] https://dojmt.gov/wp-content/uploads/Consumer-Notification-Letter-689.pdf (last accessed November 14, 2022). *See also* https://www.saludclinic.org/vote-2020 (last accessed November 14, 2022).
[2] *See* Plaintiff Alexander and her minor children's Notice Letters, attached as Collective Ex A.

sensitive PII and PHI, including Social Security numbers. As a result, the Private Information of Plaintiff(s) and Class remains in the hands of those cyber-criminals.

5.    The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which it was entrusted for either treatment or employment or both.

6.    Plaintiff(s) bring this class action lawsuit on behalf of herself, her minor children, and all others similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff(s) and other Class Members that their information had been subject to the unauthorized access of an unknown third party and including in that notice precisely what specific types of information were accessed and taken by cybercriminals.

7.    Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant Salud's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff(s)' and Class Members' Private Information was a known risk to Defendant. Thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

8.    Defendant disregarded the rights of Plaintiff(s) and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff(s)' and Class Members' Private Information; failing to take standard and

reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff(s) and Class Members with prompt and full notice of the Data Breach.

9.    In addition, Defendant Salud failed to properly monitor the computer network and systems that housed the Private Information. Had Salud properly monitored its property, it would have discovered the intrusion sooner rather than allowing cybercriminals unimpeded access to the PII and PHI of Plaintiff(s) Class Members.

10.    Plaintiff(s)' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant Salud collected and maintained is now in the hands of data thieves.

11.    Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

12.    As a result of the Data Breach, Plaintiff(s) and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff(s) and Class Members must now and for years into the future closely monitor their financial accounts to guard against identity theft.

13.    Plaintiff(s) and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

14.    Through this Complaint, Plaintiff(s) seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

15.    Accordingly, Plaintiff(s) bring this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) negligence *per se*, (iii) breach of implied contract, (iv) breach of fiduciary duty; (v) intrusion upon seclusion; (vi) unjust enrichment; (vii) declaratory judgment; (viii) and violation of Colorado Consumer Protection Act.

16.    Plaintiff(s) seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant.

## PARTIES

17.    Plaintiff Karen Alexander is and at all times mentioned herein was an individual citizen of the State of Colorado, residing in the city of Fort Collins (Larimer County). She and the members of her family are current patients of Salud. On or about November 12, 2022, Ms. Alexander received Notices of the Data Breach dated November 7, 2022, attached collectively in Exhibit A.

18.    Defendant Salud Family Health, Inc. is a 501c3 nonprofit corporation with its principal place of business located at 203 S Rollie Ave, Fort Lupton, Colorado 80621. It can be served through its registered agent, John Santistevan, at its principal place of business.

## JURISDICTION AND VENUE

19.     Jurisdiction is proper in this Court because Defendant Salud is a Colorado 501c3 Nonprofit corporation, and Defendant's principal place of business is located in Fort Lupton, Weld County, Colorado.

20.     Venue is proper in this Court pursuant to Colo. R. Civ. P. 98(c) as a substantial portion of the acts and transactions that constitute violations of law complained of herein occurred in Weld County, Colorado, and Defendant conducts substantial business throughout Weld County.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

21.     Defendant Salud, which has been providing health services in Colorado since 1970.[3] Salud provides medical, dental, behavioral, pediatric, and pharmaceutical services in the State of Colorado to low-income families.[4] It employs around 613 people and serves approximately 68,000 patients. It has "13 clinic locations, 10 school sites and a mobile unit" all located in the State of Colorado.[5]

22.     According to its Website, Salud's thirteen clinics are spread throughout northeastern Colorado with the exception of one clinic being located in southeastern Colorado. In addition, its mobile units are designed to travel the state in order to provide healthcare for "migrant and seasonal farmworkers and refugee populations."[6]

---

[3] https://www.saludclinic.org/history (last accessed November 14, 2022)
[4] https://www.saludclinic.org/services (last accessed November 14, 2022)
[5] https://www.saludclinic.org/ (last accessed November 14, 2022)
[6] https://www.saludclinic.org/about-us (last accessed November 14, 2022)

23.    For the purposes of this Class Action Complaint, all of Salud's associated locations will be referred to collectively as "Salud."

24.    In the ordinary course of receiving medical care services from Defendant Salud, each patient and/or employee must provide (and Plaintiff(s) did provide) Defendant Salud with sensitive, personal, and private information, such as their:

- Name, address, phone number, and email address;

- Date of birth;

- Social Security number;

- Employer with contact information;

- Primary and secondary insurance policy holders' name, address, date of birth, and Social Security number;

- biometric information;

- username and password information

- Driver's license or state or federal identification;

- Information relating to the individual's medical and medical history;

- Insurance information and coverage; and

- Financial account information/credit card number

25.    Defendant also creates and stores medical records and other protected health information for its patients, including records of treatments and diagnoses.

26.    Upon information and belief, Salud's HIPAA Privacy Policy is provided to every patient both prior to receiving treatment and upon request.

27.    Defendant Salud agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiff(s) and Class Members safely,

7

confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act ("HIPAA").

28.    In its "Privacy Policy," Salud tells its patients (including Plaintiff(s) and the Class) that: "this medical practice will, consistent with its legal obligations, not use or disclose health information which identifies you without your written authorization."[7]

29.    Yet, through its failure to properly secure the Private Information of Plaintiff(s) and Class, Salud has not adhered to its own promises of patient rights.

30.    The patient and employee information held by Defendant Salud in its computer system and network included the highly sensitive Private Information of Plaintiff(s) and Class Members.

### *The Data Breach*

31.    A Data Breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like Salud.

32.    According to the undated "Notice of Security Incident" that Salud posted on its website, "[o]n September 5, 2022, Salud became aware of suspicious activity in certain computer systems." Its investigation found that "there was an unauthorized access to the affected systems on that date and certain data may have been accessed or taken."[8]

33.    However, without further explanation, in its website notice letter Salud claims that the "security of information in Salud's care is one of its highest priorities, and Salud has

---

[7] https://www.saludclinic.org/_files/ugd/ad209d_9ccba9ddf0da48d495801900240e4393.pdf (last accessed November 14, 2022).

[8] https://www.saludclinic.org/vote-2020 (last accessed November 14, 2022).

security measures in place to protect sensitive information in its care." [9] Then it claims to be "reviewing and enhancing those policies and procedures to further protect against similar incidents moving forward." [10]

34.     In other words, it appears that although Salud claims it "takes the confidentiality, privacy, and security of information in our care seriously," it did not even figure out that cybercriminals accessed and stole the Private Information held on Salud's systems, while these cybercriminals were still accessing its systems and taking files.[11]

35.     The website Notice posted to Montana's State Attorney General's Data Breach list also states that some of the accessed files contained "your name, Social Security number, driver's license number or Colorado identification card number, financial account information/credit card number, passport number, medical treatment and diagnosis information, health insurance information, biometric data, and username and password."[12]

36.     As reported to Department of Health and Human Services Office for Civil Rights ("DHH Report") on October 5, 2022, Salud's investigation revealed that the Private Information (including both PII and PHI) of "501 individuals" was accessed in this Data Breach.[13] Upon information and belief, this calculation of individuals affected is simply a "placeholder" for Salud until it determines the actual number of individuals affected.

37.     Defendant had obligations created by HIPAA, FTCA, contract, industry standards, common law, and representations made to Plaintiff(s) and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

---

[9] *Id.*
[10] *Id.*
[11] *See* Notice Letter, Ex. A
[12] https://dojmt.gov/wp-content/uploads/Consumer-Notification-Letter-689.pdf.
[13] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed November 14, 2022).

38.    Plaintiff(s) and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

### The Data Breach was a
### Foreseeable Risk of which Defendant was on Notice.

39.    It is well known that PII, including Social Security numbers in particular, is a valuable commodity and a frequent, intentional target of cyber criminals. Companies that collect such information, including Salud, are well-aware of the risk of being targeted by cybercriminals.

40.    Individuals place a high value not only on their PII, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

41.    A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss." [14]

---

[14] "Victims of Identity Theft, 2018," U.S. Department of Justice (April 2021, NCJ 256085). available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed November 14, 2022).

42.     Individuals, like Plaintiff(s) and Class members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hacker's purposes.

43.     Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiff(s) and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse.

44.     The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[15]

45.     In 2021, there were a record 1,862 data breaches last year, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[16]

46.     Additionally in 2021, there was a 15.1% increase in cyberattacks and data breaches since 2020. Over the next two years, when security executives were polled, they uniformly predicted an increase in attacks from "social engineering and ransomware" as nation-

---

[15] https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed November 14, 2022).
[16] https://www.cnet.com/tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last accessed November 14, 2022).

states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[17]

47.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

48.    According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data." [18] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[19]

49.    Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Salud failed to take appropriate steps to protect the PII of Plaintiff(s) and the proposed Class from being compromised.

***Data Breaches are Rampant in Healthcare.***

---

[17] https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last accessed November 14, 2022).
[18] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last accessed November 14, 2022).
[19] *Id.*

50.     Defendant's data security obligations were particularly important given the substantial increase in Data Breaches in the healthcare industry preceding the date of the breach.

51.     According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[20]

52.     Healthcare organizations (including Salud) are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[21]

53.     The HIPAA Journal article goes on to explain that patient records, like those stolen from Salud, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[22]

---

[20] https://www.hipaajournal.com/why-do-criminals-target-medical-records/ (last accessed November 14, 2022).
[21] *Id.*
[22] *Id.*

54.     According to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[23]

55.     According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[24]

56.     The significant increase in attacks in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Defendant Salud.

### Defendant Fails to Comply with FTC Guidelines.

57.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

58.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies

---

[23] *See* Maria Henriquez, Iowa City Hospital Suffers Phishing Attack, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited on November 14, 2022).
[24] https://www.ahu.edu/blog/data-security-in-healthcare (last visited on November 14, 2022).

to correct any security problems.[25] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[26]

59.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

60.    The FTC has brought enforcement actions against businesses like Salud's for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

61.    These FTC enforcement actions include actions against healthcare providers like Salud and their related service providers. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

---

[25] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited November 14, 2022).
[26] *Id.*

15

62.     Defendant failed to properly implement basic data security practices.

63.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

64.     Defendant was at all times fully aware of its obligation to protect the PII and PHI of its patients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### Defendant Fails to Comply with Industry Standards.

65.     As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

66.     Several best practices have been identified that a minimum should be implemented by healthcare providers like Defendant, including but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data, and; limiting which employees can access sensitive data.

67.     Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

68.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

69.    These frameworks are existing and applicable industry standards in the healthcare industry, yet Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

### *Defendant's Conduct Violates HIPAA.*

70.    HIPAA requires covered entities such as Defendant to protect against reasonably anticipated threats to the security of sensitive patient health information (PHI).

71.    Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

72.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq.* These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

73.    A Data Breach such as the one Defendant experienced, is considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40.

74.    Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate it failed to comply with safeguards mandated by HIPAA regulations.

### *Defendant has Breached its Obligations to Plaintiff(s) and Class.*

75.    Defendant breached its obligations to Plaintiff(s) and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard Salud's computer systems and its patients' and employees' data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.    Failing to adequately protect patients' and employees' Private Information;

c.    Failing to properly monitor its own data security systems for existing intrusions;

d.    Failing to ensure that vendors with access to Defendant's protected health data employed reasonable security procedures;

e.    Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

f.   Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

g.   Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

h.   Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i.   Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j.   Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k.   Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

l.   Failing to train all members of Defendant's workforce effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of their workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or

19

m. Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR 164.304 definition of encryption).

76.    As the result of maintaining its computer systems in manner that required security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiff(s)' and Class Members' Private Information.

77.    Accordingly, as outlined below, Plaintiff(s) and Class Members now face an increased risk of fraud and identity theft.

### *Defendant Fails to Protect Children's Private Information.*

78.    According to a 2021 study by Javelin Research and Strategy, child identity fraud affects one out of every 500 children annually, costs U.S. families nearly $1 billion annually, and takes parents and guardians far longer to resolve than adult identity fraud. [27]

79.    According to this research, "One of the most daunting challenges, as it relates to detecting the theft or compromise of a child's identity, is that fraud typically takes place years after a child's personally identifiable information (PII) is initially breached." Because children are not filing taxes, applying for loans, and opening bank accounts, misuse of their Private

---

[27] https://www.javelinstrategy.com/research/child-identity-fraud-web-deception-and-loss (last accessed November 14, 2022).

Information is less often flagged early, and therefore can abused for much longer before detected.[28]

80.    A child's "blank slate" provides cyber criminals the opportunity to create a "synthetic" identity using both real and fictitious information to seek loans since a child's Social Security number completely lacks a credit history.[29]

81.    According to the FTC, cybercriminals armed with children's Social Security numbers, name, address, and date of birth are able to:  apply for government benefits, like health care coverage or nutrition assistance; open a bank or credit card account; apply for a loan; sign up for a utility service, like water or electricity; or rent a place to live.[30]

82.    Although checking a child's credit report is a step that concerned parents should take, it is more difficult than checking an adult's credit report. A child's credit check may require requesting that each of the three reporting agencies perform a manual search and may require providing additional documentation, including but not limited to: the parent or legal guardian's driver's license or government-issued identification card; proof of the parent or legal guardian's address, (a utility bill, or a credit card or insurance statement); the child's birth certificate; and the child's Social Security card.[31] Each of these requirements can present hurdles—and are time-consuming—for parents who receive notice of a data breach affecting a child. And for families with multiple children, like those of the Plaintiffs, the hurdles rise exponentially.

---

[28] *Id.*
[29] *What is Child Identity Theft?,*  Identity Theft Resource Center,
https://www.idtheftcenter.org/help_center/what-you-need-to-know-about-child-identity-theft/
(last accessed November 14, 2022).
[30] https://consumer.ftc.gov/articles/how-protect-your-child-identity-theft (last accessed
November 14, 2022).
[31] *Id.*

83.    Data breaches of children's records, like that of Salut, result in widespread and extremely long-term problems for their patient families, who may be reeling from the impact for years if not decades.

*Data Breaches Put Individuals at an Increased Risk*
*Of Fraud and Identify Theft.*

84.    Data Breaches such as the one experienced by Salud's patients and employees are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

85.    In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[32] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. *See* GAO chart of consumer recommendations, reproduced and attached as Exhibit B.  It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiff(s) and Class) must take after a breach like Salud's are both time consuming and of only limited and short-term effectiveness.

86.    The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record," discussing the same in a 2007 report as well ("2007 GAO Report").[33]

---

[32] https://www.gao.gov/assets/gao-19-230.pdf (last accessed November 14, 2022). *See* attached as Ex. B.

[33]  *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007,  https://www.gao.gov/new.items/d07737.pdf   (last visited November 14, 2022) ("2007 GAO Report").

87.     The FTC, like the GAO (*see* Exhibit B), recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[34]

88.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

89.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

90.     Theft of Private Information is also gravely serious. PII/PHI is a valuable property right.[35]

91.     It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which has conducted studies regarding data breaches:

---

[34] *See* https://www.identitytheft.gov/Steps (last visited November 14, 2022).
[35] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* 2007 GAO Report, at p. 29.

92.    Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

93.    There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff(s) and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff(s) and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

94.    As the HHS warns, "PHI can be exceptionally valuable when stolen and sold on a black market, as it often is. PHI, once acquired by an unauthorized individual, can be exploited via extortion, fraud, identity theft and data laundering. At least one study has identified the value of a PHI record at $1000 each."[36]

95.    Furthermore, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[37] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for

---

[36] https://www.hhs.gov/sites/default/files/cost-analysis-of-healthcare-sector-data-breaches.pdf at 2 (citations omitted) (last accessed November 14, 2022).

[37] *Identity Theft and Your Social Security Number*, Social Security Administration (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited November 14, 2022).

unemployment benefits, or apply for a job using a false identity.[38] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

96.     Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[39]

97.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[40]

98.     In recent years, the medical and financial services industries have experienced disproportionally higher numbers of data theft events than other industries. Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was

---

[38] *Id.* at 4.

[39] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited November 14, 2022).

[40] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited November 14, 2022).

put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## PLAINTIFF(S)' EXPERIENCES

### *Plaintiff Karen Alexander*

99.     Plaintiff Karen Alexander is and at all times mentioned herein was an individual citizen residing with her family members in the State of Colorado, in the city of Fort Collins (Larimer County).

100.    Plaintiff Alexander and her family members are current patients of Salud at all times relevant to this Complaint.

101.    On or about November 12, 2022, Plaintiff Alexander received Notice of Data Breach Letters related to Salud's Data Breach dated November 7, 2022. In addition to her own Notice Letter, she received Notice Letters on behalf of multiple other family members including her minor children. *See* Collective Exhibit A.

102.    The Notice Letters that Plaintiff received does not explain exactly which parts of their PII and PHI were accessed and taken but instead each generically states that the files may have contained "your name, Social Security number, driver's license number or Colorado identification card number, financial account information/credit card number, passport number, medical treatment and diagnosis information, health insurance information, biometric data and username and password." *See* Ex. A.

103.    Plaintiff Alexander is especially alarmed by the vagueness of her family's stolen extremely private medical information (PHI) and equally by the fact that their Social Security numbers were identified as among the breached data on Salud's computer system.

104.    Since she was only recently notified of the breach, Plaintiff Alexander has not had sufficient time to take mitigation efforts against fraud and identity theft of her own and her family's PII. However, she realizes she must continue monitoring their financial accounts as she has begun to do already, and which will take at least an hour every week. This is more time than she spent prior to learning of the Salud's Data Breach. Having to do this every week not only wastes her time as a result of Salud's negligence, but it also causes her great concern for herself and her family.

105.    Starting in approximately September 2022, Plaintiff Alexander began receiving an excessive number of spam calls on the same cell phone number that she provided to Salud. These calls are a distraction, must be deleted, and wastes her time each day. Once she received the Notice Letter, and given the timing of the Data Breach, she believes that the calls are related to the Data Breach and her stolen PII.

106.    In addition, Plaintiff Alexander receives *many* spam emails and texts now, and which she did not typically receive before. She cannot figure out any other explanation than that the increase is related to Salud's Data Breach, which included her own and her family's Private Information.

107.    Plaintiff Alexander is aware that cybercriminals often sell Private Information, and that hers and her family's Private Information could be abused months or even years after this Data Breach.

108.    Had Plaintiff Alexander been aware that Salud's computer systems were not secure, she would not have entrusted Salud with her own and her family's PII and PHI.

## **PLAINTIFF(S)' AND CLASS MEMBERS' INJURIES**

165.    To date, Defendant Salud has done absolutely nothing to compensate Plaintiff(s) and Class Members for the damages they sustained in the Data Breach.

166.    Defendant Salud has merely offered one year credit monitoring services through Kroll, a tacit admission that its failure to protect their Private Information has caused Plaintiff(s) and Class great injuries. *See* Ex. A. This one-year limitation is inadequate when victims are likely to face many years of identity theft, especially in families that have received multiple Notice Letters and have multiple minor children (as in the situation of the Plaintiff(s)' family here), this limited time of identity theft coverage and an even shorter enrollment period is insufficient given the long-term risk of fraud the families face when Social Security numbers, especially, are sold on the Dark Web.

92.    Salud's offer fails to sufficiently compensate victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiff(s)' and Class Members' Private Information, out of pocket costs, and the time they are required to spend attempting to mitigate their injuries.

93.    Furthermore, Defendant Salud's credit monitoring offer and advice (*see* Ex. A) to Plaintiff(s) and Class Members squarely places the burden on Plaintiff(s) and Class Members, rather than on the Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach. Defendant merely sent instructions to Plaintiff(s) and Class Members about actions they can affirmatively take to protect themselves.

94.    Plaintiff(s) and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

95.     Plaintiff(s)'and Class Members' Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

96.     Plaintiff(s) and Class were damaged in that their Private Information is now in the hands of cyber criminals, sold and potentially for sale for years into the future.

97.     As a direct and proximate result of Defendant's conduct, Plaintiff(s) and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft.

98.     As a direct and proximate result of Defendant's conduct, Plaintiff(s) and Class Members have been forced to expend time dealing with the effects of the Data Breach.

99.     Plaintiff(s) and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff(s) and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

100.    Plaintiff(s) and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff(s) and Class Members.

101.    Plaintiff(s) and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

102.    Plaintiff(s) and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

103.    Plaintiff(s) and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.  Finding fraudulent charges;

b.  Canceling and reissuing credit and debit cards;

c.  Purchasing credit monitoring and identity theft prevention;

d.  Addressing their inability to withdraw funds linked to compromised accounts;

e.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f.  Placing "freezes" and "alerts" with credit reporting agencies;

g.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h.  Contacting financial institutions and closing or modifying financial accounts;

i.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j.  Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k.  Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

104. Moreover, Plaintiff(s) and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online and that access to such data is password-protected.

105. Further, as a result of Defendant's conduct, Plaintiff(s) and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

106. Defendant's delay in identifying and reporting the Data Breach caused additional harm. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft.

## CLASS ACTION ALLEGATIONS

107. Plaintiff(s) bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") pursuant to Colo. R. Civ. P. 23.

108. Plaintiff(s) propose the following Class definition, subject to amendment as appropriate:

> All persons whose Private Information was compromised as a result of the Data Breach discovered by Salud in September 2022 and for which it provided notice on or about November 2022 (the "Class").

109. Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

110.    Plaintiff(s) hereby reserve the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery. The proposed Class meets the criteria for certification because plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

111.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiff(s) at this time, based upon information and belief, the amount Class members notified of the data breach is growing and well into the thousands.

112.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff(s)' and Class Members' Private Information;

b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.    Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.     Whether Defendant breached its duty to Class Members to safeguard their Private
       Information;

g.     Whether computer hackers obtained Class Members' Private Information in the
       Data Breach;

h.     Whether Defendant knew or should have known that its data security systems and
       monitoring processes were deficient;

i.     Whether Plaintiff(s) and Class Members suffered legally cognizable damages as a
       result of Defendant's misconduct;

j.     Whether Defendant's conduct was negligent;

k.     Whether Defendant's conduct was per se negligent;

l.     Whether Defendant's acts, inactions, and practices complained of herein amount
       to acts of intrusion upon seclusion under the law;

m.     Whether Defendant was unjustly enriched;

n.     Whether Defendant failed to provide notice of the Data Breach in a timely
       manner; and

o.     Whether Plaintiff(s) and Class Members are entitled to damages, civil penalties,
       punitive damages, and/or injunctive relief.

113.    <u>Typicality</u>. Plaintiff(s)' claims are typical of those of other Class Members
because Plaintiff's Private Information, like that of every other Class member, was compromised
in the Data Breach.

114.    <u>Adequacy of Representation</u>. Plaintiff(s) will fairly and adequately represent
and protect the interests of the Members of the Class. Plaintiff(s)' Counsel is competent and
experienced in litigating class actions, including data privacy litigation of this kind.

115.   <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff(s) and Class Members, in that all the Plaintiff(s)' and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

116.   <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

117.   Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

118.   Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.   Whether Defendant failed to timely notify the public of the Data Breach;

34

b.      Whether Defendant owed a legal duty to Plaintiff(s) and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c.      Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.      Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.      Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

f.      Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

119.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

### First Count
### Negligence
### (On Behalf of Plaintiff(s) and Class Members)

120.    Plaintiff(s) re-alleges and incorporates the above allegations as if fully set forth herein.

121.    Defendant Salud required Plaintiff(s) and Class Members to submit non-public personal information in order to obtain healthcare/medical services and/or employment.

122.    By collecting and storing this data in Salud's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a Data Breach.

123.    Defendant owed a duty of care to Plaintiff(s) and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

124.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant Salud and its patients and employees, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach or data breach.

125.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).  Some or all of the healthcare, medical, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

126.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

127.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

128.    Defendant breached its duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

    b.    Failing to adequately monitor the security of their networks and systems;

    c.    Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

    d.    Allowing unauthorized access to Class Members' Private Information;

    e.    Failing to detect in a timely manner that Class Members' Private Information had been compromised;

    f.    Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

    g.    Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

129.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

130.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

131.    Plaintiff(s) and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

132.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff(s) and Class Members in an unsafe and unsecure manner.

133.    Plaintiff(s) and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**Second Count**
**Negligence *Per Se***
**(On Behalf of Plaintiff(s) and All Class Members)**

134.    Plaintiff(s) re-allege the above allegations as if fully set forth herein.

135.    Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff(s)' and Class Members' Private Information.

136.    Pursuant to HIPAA, 42 U.S.C. § 1302d, et seq., Defendant had a duty to implement reasonable safeguards to protect Plaintiff(s)' and Class Members' Private Information.

137.    Pursuant to HIPAA, Defendant had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." See definition of encryption at 45 C.F.R. § 164.304.

138.    Defendant breached its duties to Plaintiff(s) and Class Members under the Federal Trade Commission Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff(s)' and Class Members' Private Information.

139.    Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

140.    But for Defendant's wrongful and negligent breach of their duties owed to Plaintiff(s) and Class Members, Plaintiff(s) and Class Members would not have been injured.

141.    The injury and harm suffered by Plaintiff(s) and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that they failing to meet its duties, and that Defendant's breach would cause Plaintiff(s) and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

142.     As a direct and proximate result of Defendant's negligent conduct, Plaintiff(s) and

Class Members have suffered injury and are entitled to compensatory, consequential, and

punitive damages in an amount to be proven at trial.

**Third Count**
**Breach of Implied Contract**
**(On Behalf of Plaintiff(s) and Class Members)**

143.     Plaintiff(s) re-allege the above allegations as if fully set forth herein.

144.     When Plaintiff(s) and Class Members provided their Private Information to

Defendant Salud in exchange for Defendant Salud's medical services, they entered into implied

contracts with Defendant pursuant to which Defendant agreed to reasonably protect such

information.

145.     Defendant Salud solicited, offered, and invited Class Members to provide their

Private Information as part of Defendant's regular business practices. Plaintiff(s) and Class

Members accepted Defendant's offers and provided their Private Information to Defendant.

146.     In entering into such implied contracts, Plaintiff(s) and Class Members reasonably

believed and expected that Defendant's data security practices complied with relevant laws and

regulations, including HIPAA, and were consistent with industry standards.

147.     Plaintiff(s) and Class Members paid money to Defendant to Defendant with the

reasonable belief and expectation that Defendant would use part of its earnings to obtain

adequate data security. Defendant failed to do so.

148.     Plaintiff(s) and Class Members would not have entrusted their Private Information

to Defendant in the absence of the implied contract between them and Defendant to keep their

information reasonably secure.

149.    Plaintiff(s) and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

150.    Plaintiff(s) and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

151.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

152.    As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

153.    Plaintiff(s) and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

154.    Plaintiff(s) and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**Fourth Count**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff(s) and Class Members)**

155.    Plaintiff(s) re-allege the above allegations as if fully set forth herein.

156.    In light of the special relationship between Defendant Salud and Plaintiff(s) and Class Members, whereby Defendant became guardian of Plaintiff(s)' and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiff(s) and Class Members, (1) for the safeguarding

41

of Plaintiff(s)' and Class Members' Private Information; (2) to timely notify Plaintiff(s) and
Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate
records of what information (and where) Defendant did and does store.

157.    Defendant has a fiduciary duty to act for the benefit of Plaintiff(s) and Class
Members upon matters within the scope of Salud's relationship with its current and former
patients and employees, in particular, to keep secure their Private Information.

158.    Defendant breached its fiduciary duties to Plaintiff(s) and Class Members by
failing to diligently discovery, investigate, and give notice of the Data Breach in a reasonable
and practicable period of time.

159.    Defendant breached its fiduciary duties to Plaintiff(s) and Class Members by
failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff(s)' and
Class Members' Private Information.

160.    Defendant breached its fiduciary duties owed to Plaintiff(s) and Class Members
by failing to timely notify and/or warn Plaintiff(s) and Class Members of the Data Breach.

161.    Defendant breached its fiduciary duties to Plaintiff(s) and Class Members by
otherwise failing to safeguard Plaintiff(s)' and Class Members' Private Information.

162.    As a direct and proximate result of Defendant's breaches of its fiduciary duties,
Plaintiff(s) and Class Members have suffered and will suffer injury, including but not limited to:
(i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private
Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery
from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity
costs associated with effort expended and the loss of productivity addressing and attempting to
mitigate the actual and future consequences of the Data Breach, including but not limited to

efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff(s) and Class Members; and (vii) the diminished value of Defendant's services they received.

163.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff(s) and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

### Fifth Count
### Intrusion Upon Seclusion / Invasion of Privacy
### (On Behalf of Plaintiff(s) and All Class Members)

164.    Plaintiff(s) re-allege the above allegations as if fully set forth herein.

165.    The State of Colorado recognizes the tort of Intrusion upon Seclusion, and adopts the formulation of that tort found in the Restatement (Second) of Torts, which states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B (1977).

166.    Plaintiff(s) and Class Members had a reasonable expectation of privacy in the Private Information Defendant mishandled.

167.    Defendant's conduct as alleged above intruded upon Plaintiff(s)' and Class Members' seclusion under common law.

168.    By intentionally failing to keep Plaintiff(s)' and Class Members' Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff(s)' and Class Members' privacy by:

    a.    Intentionally and substantially intruding into Plaintiff(s)' and Class Members' private affairs in a manner that identifies Plaintiff(s) and Class Members and that would be highly offensive and objectionable to an ordinary person; and

    b.    Intentionally publicizing private facts about Plaintiff(s) and Class Members, which is highly offensive and objectionable to an ordinary person; and

    c.    Intentionally causing anguish or suffering to Plaintiff(s) and Class Members.

169.    Defendant knew that an ordinary person in Plaintiff(s)' or Class Members' position would consider Defendant's intentional actions highly offensive and objectionable.

170.    Defendant invaded Plaintiff(s)' and Class Members' right to privacy and intruded into Plaintiff(s)' and Class Members' private affairs by intentionally misusing and/or disclosing their Private Information without their informed, voluntary, affirmative, and clear consent.

171.    Defendant intentionally concealed from and delayed reporting to Plaintiff(s) and Class Members a security incident that misused and/or disclosed their Private Information without their informed, voluntary, affirmative, and clear consent.

172.    The conduct described above was at or directed at Plaintiff(s) and the Class Members.

173.    As a proximate result of such intentional misuse and disclosures, Plaintiff(s)' and Class Members' reasonable expectations of privacy in their Private Information was unduly frustrated and thwarted. Defendant's conduct amounted to a substantial and serious invasion of

Plaintiff(s)' and Class Members' protected privacy interests causing anguish and suffering such that an ordinary person would consider Defendant's intentional actions or inaction highly offensive and objectionable.

174.    In failing to protect Plaintiff(s)' and Class Members' Private Information, and in intentionally misusing and/or disclosing their Private Information, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiff(s)' and Class Members' rights to have such information kept confidential and private. Plaintiff(s), therefore, seek an award of damages on behalf of themselves and the Class.

**Sixth Count**
**Unjust Enrichment**
**(On Behalf of Plaintiff(s) and Class Members)**

175.    Plaintiff(s) re-allege the above allegations as if fully set forth herein. Plaintiff(s) bring this claim individually and on behalf of all Class Members. This count is pleaded in the alternative to the breach of implied contract count above.

176.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff(s) and the Class Members.

177.    As such, a portion of the payments made by or on behalf of Plaintiff(s) and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

178.    Plaintiff(s) and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and/or its agents and in so doing provided Defendant with their Private Information. In exchange, Plaintiff(s) and Class Members

should have received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

179.    Defendant knew that Plaintiff(s) and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff(s) and Class Members for business purposes.

180.    In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information.  Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff(s) and Class Members by utilizing cheaper, ineffective security measures. Plaintiff(s) and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

181.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff(s) and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

182.    Defendant failed to secure Plaintiff(s)' and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiff(s) and Class Members provided.

183.    Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

184.    If Plaintiff(s) and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

185.    Plaintiff(s) and Class Members have no adequate remedy at law.

186.    As a direct and proximate result of Defendant's conduct, Plaintiff(s) and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff(s) and Class Members.

187.    As a direct and proximate result of Defendant's conduct, Plaintiff(s) and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

188.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff(s) and Class Members, proceeds that they unjustly received from

them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff(s) and Class Members overpaid for Defendant's services.

**Seventh Count**
**Declaratory Judgment**
**(On Behalf of Plaintiff(s) and Class Members)**

189.    Plaintiff(s) re-allege the above allegations as if fully set forth herein.

190.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

191.    An actual controversy has arisen in the wake of the Salud data breach regarding its present and prospective common law and other duties to reasonably safeguard its patients' and employees' Private Information and whether Salud is currently maintaining data security measures adequate to protect Plaintiff(s) and Class members from future data breaches that compromise their Personal Information.

192.    Plaintiff(s) allege that Salud's data security measures remain inadequate. Plaintiff(s) will continue to suffer injury as a result of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

193.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.    Salud continues to owe a legal duty to secure individuals' Private Information and to timely notify individuals of a data breach under the common law, Section 5 of the FTC Act, and various state statutes;

    b.    Salud continues to breach this legal duty by failing to employ reasonable measures to secure patients' and employees' Private Information.

194.    The Court also should issue corresponding prospective injunctive relief requiring Salud to employ adequate security protocols consistent with law and industry standards to protect patients' and employees' Private Information.

195.    If an injunction is not issued, Plaintiff(s) and Class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Salud. The risk of another such breach is real, immediate, and substantial. If another breach at Salud occurs, Plaintiff(s) and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

196.    The hardship to Plaintiff(s) and Class Members if an injunction does not issue exceeds the hardship to Salud if an injunction is issued. Among other things, if another massive data breach occurs at Salud, Plaintiff(s) and class members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Salud of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Salud has a pre-existing legal obligation to employ such measures.

197.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Salud,

thus eliminating the additional injuries that would result to Plaintiffs and the individuals whose Private Information would be further compromised.

**Eighth Count**
**Violation of Colorado Consumer Protection Act**
**Colo. Rev. Stat. § 6-1-105(1), et seq.**
**(On Behalf of Plaintiff(s) and the Class)**

198.    Plaintiff(s) re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

199.    Plaintiff(s) and Colorado Subclass Members were consumers of Defendant's services and injured as result of Defendant's deceptive trade practices.

200.    As alleged herein this Complaint, Defendant engaged in unfair or deceptive acts or practices in the conduct of consumer transactions in violation of the Colorado Consumer Protection Act, including but not limited to:

a.    representing that its services were of a particular standard or quality that it knew or should have known were of another;

b.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff(s) and Class Members' Private Information, which was a direct and proximate cause of the Cyber-Attack and data breach;

c.    Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Cyber-Attack and data breach;

d.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45 and HIPAA, 45 C.F.R. § 164, which was a direct and proximate cause of the Data Breach;

e.  Misrepresenting that it would protect the privacy and confidentiality of
Plaintiff(s)' and Class Members' Private Information, including by implementing
and maintaining reasonable security measures;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably
or adequately secure Plaintiff(s)' and Class Members' Private Information; and

g.  Omitting, suppressing, and concealing the material fact that it did not comply with
common law and statutory duties pertaining to the security and privacy of
Plaintiff(s)' and Class Members' Personal Information, including duties imposed
by the FTC Act, 15 U.S.C. § 45 and HIPAA, 45 C.F.R. § 164, which was a direct
and proximate cause of the Cyber-Attack and data breach.

201.  Defendant's representations and omissions were material because they were likely
to deceive reasonable consumers about the adequacy of Salud's data security and ability to
protect the confidentiality of consumers' Private Information.

202.  In addition, Defendant's failure to secure consumers' PHI violated HIPAA and
the FTCA and therefore violates the Colorado Consumer Protection Act.

203.  Also, Defendant's failure to give timely notice of this Data Breach in violation
Colorado's Notification of security breach statute, Colo. Rev. Stat. Ann. § 6-1-716 is an unfair or
deceptive act, and therefore violates the Colorado Consumer Protection Act.

204.  Defendant knew or should have known that its computer systems and data
security practices were inadequate to safeguard the PHI of Plaintiff(s) and Class Members, deter
hackers, and detect a breach within a reasonable time, and that the risk of a data breach was
highly likely.

205.    As a direct and proximate result of Defendant's violation of the Colorado Consumer Protection Act, Plaintiffs and Class Members are entitled to a judgment against Salud for the greater of the amount of actual damages sustained or five hundred dollars or three times the amount of actual damages sustained and the costs of the action together with reasonable attorneys' fees pursuant to the Colorado Consumer Protection Act, to the extent allowed under the Act, injunctive and declaratory relief including a declaration that Defendant provide proper notice of the Data Breach, and such other further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff(s) pray for judgment as follows:

a) For an Order certifying this action as a class action and appointing Plaintiff(s) and their counsel to represent the Class;

b) For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff(s)' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff(s) and Class Members;

c) For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e) Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiff(s) and the Class;

f)  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g)  For an award of punitive damages, as allowable by law;

h)  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i)  Pre- and post-judgment interest on any amounts awarded; and

j)  Such other and further relief as this court may deem just and proper.


## JURY TRIAL DEMANDED

Plaintiff(s) demand a trial by jury on all claims so triable.

Dated: November 14, 2022                Respectfully submitted,

*/s/ Rick D. Bailey*

Rick D. Bailey, Esq.
Atty. Reg. #26554
**Law Office of Rick D. Bailey, Esq.**
1801 Broadway, Ste. 528
Denver, Colorado 80202
Phone: (720) 676-6023
Email: rick@rickbaileylaw.com

Gary E. Mason*
Danielle Perry*
Lisa A. White*
**MASON LLP**
5101 Wisconsin Avenue, NW
Suite 305
Washington, DC 20016
Tel: (202) 429-2290
gmason@masonllp.com
dperry@masonllp.com
lwhite@masonllp.com

*Attorneys for Plaintiff*
*\*pro hac vice to be filed*